**STATE of Minnesota, Respondent,**

v.

**Matthew James CLARKIN, Appellant.**

**Nos. A10–1286, A11–0548.**

Supreme Court of Minnesota.

Aug. 1, 2012.

Lori Swanson, Attorney General, Saint Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Thomas A. Weist, Assistant County Attorney, Minneapolis, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Richard Schmitz, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

ANDERSON, PAUL H., Justice.

Matthew James Clarkin seeks review of a court of appeals published opinion affirming the district court's decision to deny Clarkin 222 days of jail credit. Clarkin sought to apply 222 days of jail credit to his harassment/stalking conviction sentence even though the jail credit claim was based on time Clarkin spent in custody on an unrelated parole violation. When the district court sentenced Clarkin on one count of felony harassment/stalking following a plea agreement, the court implicitly denied Clarkin any credit for time spent in custody on the parole violation. Following his sentencing, Clarkin appealed to the court of appeals; but he then filed a motion to stay the appeal and allow a remand for postconviction proceedings. His motion was granted.

The postconviction court held that Clarkin was not entitled to any jail credit because the police did not have probable cause to arrest Clarkin on the harassment/stalking charge until after he was released from prison on the parole violation. The court of appeals affirmed the district court in a published opinion but did so on different grounds. The court of appeals held that regardless of when the State had probable cause to charge Clarkin, he was not entitled to any jail credit for time spent in custody because the parole violation and the harassment/stalking charge would have been sentenced consecutively, and consecutive sentences are not eligible for jail credit. We affirm the result reached by the court of appeals but do so on different grounds.

In April 2008 appellant Matthew James Clarkin was released from prison after having served a sentence for second-degree assault against his former girlfriend, S.A.S. The assault conviction was the result of Clarkin having stabbed S.A.S. in

the leg with a knife. As part of his conditions for release, Clarkin was placed under intensive supervision, which supervision required that he participate in rehabilitative programming, refrain from using or possessing intoxicants, and not violate an Order for Protection (OFP) regarding S.A.S.[1] In May 2008 an arrest warrant was issued for Clarkin because his failure to participate in required programming and his possession or use of intoxicants violated the terms of his supervised release.

On July 5, 2008, the police were dispatched to a home on Wentworth Avenue in Richfield in response to a report of property damage. Upon arrival at the home, the police spoke to S.A.S., who stated that she lived at the home and believed Clarkin had spray-painted graffiti on the home, the garage, and a motorcycle parked in the driveway. In surveying the property, the police observed that the home, garage, and motorcycle had been spray-painted with a "considerable amount of black spray paint." The police saw several expletives painted on the home, including the word "hore." S.A.S. and the motorcycle owner stated that they believed Clarkin had done the spray-painting, and that the spray-painting had to have occurred between 2:00 a.m. and 8:52 a.m.

On July 11, 2008, S.A.S.'s daughter and the daughter's boyfriend reported to the police that they saw Clarkin in the backyard of a home adjacent to S.A.S.'s home. On July 12, 2008, officers went to S.A.S.'s father's home in Minneapolis in response to a report that someone had spray-painted words on the home. At the scene, the police found the words "Daddys hore" and other similar words painted in two places on the front of the home and in one place on the south side of the home. According

to police, the "graffiti style of the writing, context, word choice, and identical misspellings evidenced a clear match between the person who caused the damage in this incident and the person who caused the damage in the July 5, 2008 incident at S.A.S.'s residence." S.A.S.'s father told the police he thought Clarkin was responsible for painting the graffiti, because the father had recently seen Clarkin across the street from the home. The father believed Clarkin had been watching the home during the day. The father said that he knew Clarkin was subject to an outstanding arrest warrant.

Police officers arrested Clarkin on July 13, 2008, on the outstanding arrest warrant based on his violation of the terms of his supervised release. The police found two spray paint cans hidden under a porch and a grill at the arrest location. On July 24, 2008, the police spoke to Clarkin and showed him photographs of the graffiti from the July 5, 2008, incident but Clarkin denied spray-painting S.A.S.'s home. Following his arrest, Clarkin remained in custody at the Hennepin County Jail from July 13 through July 31, 2008, and was then transferred to the Minnesota Correctional Facility at Lino Lakes where he remained until his release from custody on February 19, 2009.

No graffiti incidents were reported by S.A.S. or her family members while Clarkin was in custody. But, between April 12, 2009, and November 6, 2009, the police responded to or identified 11 additional incidents involving graffiti or potential OFP violations at the homes of S.A.S., S.A.S.'s father, S.A.S.'s brother, and at the Richfield Lutheran Church, where S.A.S. is employed.

---

1. S.A.S. has had an active OFP against Clarkin dating from November 2006 and extending to November 2058. The OFP prevents Clarkin from contacting S.A.S., going to S.A.S.'s residence, going to her parents' residence, or going to her place of employment.

Two of the incidents the police responded to were reports of property damage at S.A.S.'s home. On June 14, 2009, officers observed words painted in orange spray paint on S.A.S.'s home, her garage, her motor vehicle, children's toys, a children's play area, and a child's stroller in the yard. The following words were painted at the home: "Hore, Fun Fuck, Skank, and Crack Bitch." On November 1, 2009, officers observed the phrases "Hore, Get a Fuck, Hore Skank," and other words spray-painted in black spray paint on S.A.S.'s home and garage. The police later stated that the graffiti style, misspellings, context, and word choice in these incidents were a "clear match" with earlier graffiti incidents and with each other.

The police responded to four reports of property damage to the home of S.A.S.'s father. On April 12, 2009, Easter Sunday, officers observed the words "SCAK YOUR FUCKING SCAR BIKE SCAK YOU FUCKING SNAC HORK WE WANT ARE MONYE" spray-painted in black on the south side of the home. On May 9, 2009, officers found the words "You fucking Skanc, Play Us, Fucking XXX, Fucking XXXX" spray-painted on the father's home. On July 4, 2009, officers found the words "Fun Fuck Hore, Daddy Fun Fuck, Fun Fuck, No Morals, No values," spray-painted in red on the father's home and garage. On August 7, 2009, officers observed the phrase "Your daughter are hore fun fucks skack hore" painted on the father's garage. The police concluded that the graffiti style, misspellings, context, and word choice in these incidents were a "clear match" with earlier graffiti incidents and with each other.

The police responded to three incidents of property damage at the South Minneapolis home of S.A.S.'s brother and his wife. On July 4, 2009, officers observed red graffiti on the brother's garage including the word "hore" and an insinuation that "if a person wanted sex they should visit someone by the name of '[S.A.S.].'" On August 7, 2009, the police observed the phrase "Fun Fuck," among others, spray-painted on the south side of the garage at the brother's home. On September 6, 2009, Labor Day weekend, officers observed the words "HA HA you have to love the skank" spray-painted on the walls of the brother's garage and the word "SKANK" on the side of his truck. The police concluded that the graffiti style, misspellings, context, and word choice in these incidents were a "clear match" with earlier graffiti incidents and with each other. In response to the earlier incidents, S.A.S.'s brother installed a surveillance camera, which recorded footage of a man the brother identified as Clarkin committing the September 6, 2009, incident.

The police responded to two incidents of property damage at the Richfield Lutheran Church. As previously noted, S.A.S. is employed at the church. On May 26, 2009, Memorial Day, officers observed several areas of damage on the exterior of the church, which damage included spray paint on the windows and paint on the brick exterior. On September 8, 2009, the day after Labor Day, officers observed graffiti damage to the building and some children's play equipment, including the phrase "S[A.S.] HORE HORE FUCK MORE PIG." The police concluded that the graffiti style, misspellings, context, and word choice in these two incidents were a "clear match" with the earlier graffiti incidents and with each other.

The police also identified matching graffiti at two other locations. On May 9, 2009, officers observed the words "Your skanc hore owes us money" spray-painted on the home next door to the home of S.A.S.'s father. On July 4, 2009, while responding to an incident at S.A.S.'s broth-

er's home, officers observed the same type of graffiti on a home across the alley.

In addition to the graffiti incidents, police officers responded to several calls related to prowling and potential OFP violations at or near S.A.S.'s home. On July 26, 2009, officers were dispatched to a location approximately one block from S.A.S.'s home on a report of a "suspicious male going through backyards." Police officers positively identified the suspicious male as Clarkin, who, when confronted, told the police he had gone into the backyard to urinate. The officers cited Clarkin for disorderly conduct. On November 1, 2009, in conjunction with a report of more graffiti, police officers responded to a call for a potential OFP violation. The officers went to S.A.S.'s home, and spoke to S.A.S. and her daughter's boyfriend. The boyfriend told the police that he could "smell fresh paint"; and when he went outside the home to investigate, he saw Clarkin fleeing from the yard. The boyfriend also told police he heard "the noise made by a bead shaking inside a spray can" coming from Clarkin as he ran away. On November 6, 2009, officers responded to a report of a "prowler or possible OFP violator." S.A.S.'s daughter's boyfriend told police that he saw Clarkin near the gate area of S.A.S.'s backyard. Clarkin fled after the boyfriend yelled at him.

The State filed a complaint against Clarkin on November 24, 2009, charging him with three counts of felony harassment/stalking, Minn.Stat. § 609.749, subds. 2(a)(1) (2008), subd. 4(b) (2010), arising out of the graffiti/property damage incidents on July 5, 2008, June 14, 2009, and November 1, 2009, and one count of felony viola-

tion of an order for protection, Minn.Stat. § 518B.01, subd. 14(a), (d)(1) (2010), for the prowling incident on November 6, 2009. Clarkin was arrested on December 7, 2009.

On February 3, 2010, the State amended its complaint to include eight additional counts of felony harassment/stalking, arising out of the separate graffiti/property damage incidents on July 12, 2008, April 12, 2009, May 9, 2009 and September 6, 2009; and the two OFP violation incidents on July 4, 2009 and August 7, 2009. The State also charged Clarkin with two additional counts of felony violation of an OFP for incidents on May 26 and September 8, 2009. On March 1, 2010, the State amended the complaint to change the counts for felony violation of an OFP related to the incidents on May 26 and September 8 to harassment/stalking counts. As part of the pretrial proceedings, the State announced its intention to seek an upward sentencing departure as a result of the fact that the complaint alleged a third violent crime under Minn.Stat. § 244.10, subd. 5a(a)(8) (2010).[2]

On March 2, 2010, Clarkin pleaded guilty to Count I of the complaint as part of a negotiated plea agreement. The agreement called for a 35–month executed sentence and for Clarkin to pay restitution related to each count. In exchange for the plea, the State agreed to dismiss the remaining counts at sentencing. At that time, Clarkin pleaded guilty to Count I of harassment/stalking arising out of the July 5, 2008, incident at S.A.S.'s house. In his plea agreement, Clarkin wrote that he understood the plea agreement to be as fol-

---

**2.** At the time the complaint was filed on November 24, 2009, Clarkin also had two prior qualified domestic-abuse-related offense convictions within the previous 10 years: he was convicted of domestic assault on February 11, 2003, and of second-degree assault against S.A.S. on January 2, 2007. *See* Minn.Stat. § 244.10, subd. 5a(a)(8) (2010); Minn.Stat. § 609.749, subd. 4(b) (2010).

lows: "PG to 1 ct, dismiss remaining 13. 35 mos. Credit 105, rest tbd."

When Clarkin was sentenced on March 29, 2010, he agreed to pay $1,981.05 in restitution for all counts. At the sentencing hearing, Clarkin argued that he should receive jail credit for the 231 days[3] he spent in custody from July 13, 2008, until February 19, 2009, because at that time, the State had probable cause to charge him for the July 5, 2008, incident. He also claimed credit for 113 days served from the time of his second arrest on December 7, 2009, until the sentencing hearing. The State argued that credit for the time served between July 13, 2008, and February 19, 2009, was discussed during the plea negotiations and was rejected. The district court did not explicitly rule on the 231–day credit request, but authorized the award of 113 days of jail credit when it sentenced Clarkin.

On July 26, 2010, Clarkin filed a notice of appeal, along with a motion for acceptance of late filing of his notice of appeal. The court of appeals granted the motion. On December 13, 2010, Clarkin filed a motion to stay his appeal and remand for postconviction proceedings in order to develop a factual basis and relevant legal authorities for his jail credit argument. The court granted the motion. Clarkin then filed a petition for postconviction relief. In his petition, Clarkin argued that he was entitled to 222 days of additional jail credit for the time period from July 13, 2008, to February 19, 2009, because the State had probable cause to charge him with the July 5, 2008, graffiti incident before July 13, 2008, the date when he began serving time in jail for his parole violation. The State argued that the time spent in custody between July 13, 2008, and February 19, 2009, was time served for a parole violation rather than the charges to which Clarkin pleaded guilty, and that the State did not acquire probable cause to arrest Clarkin until his "identity as the perpetrator was established when he was caught in the act. . . ."

The postconviction court denied Clarkin's petition for relief. The court concluded that Clarkin was in custody from July 13, 2009, until February 19, 2009, on an "unrelated probation violation," and that the State did not acquire probable cause to charge Clarkin with felony harassment/stalking until September 6, 2009. On March 24, 2011, Clarkin filed a notice of appeal of the order denying postconviction relief, along with a motion to reinstate his direct appeal and to consolidate both appeals. These motions were granted.

After briefing and oral argument, the court of appeals affirmed the district court in a published opinion. *State v. Clarkin*, 804 N.W.2d 148 (Minn.App.2011). The court of appeals held that Clarkin was not entitled to jail credit for time served between July 13, 2008, and February 19, 2009, regardless of whether the police had probable cause to arrest him for harassment/stalking. *Id.* at 152. The court reached its decision on the ground that Clarkin was incarcerated in July 2008 for violating the conditions of his supervised release, and such violations are presumptively sentenced consecutively and therefore the time served is not eligible for jail credit on the harassment/stalking sentence. *Id.* Clarkin filed a petition for review, which we granted. On appeal, Clarkin argues that he is entitled to 222 days

---

**3.** Clarkin's trial counsel argued that Clarkin was entitled to 231 days of jail credit at the sentencing hearing, but Clarkin's appellate counsel has argued for 222 days credit.

There is no explanation for the discrepancy in the record, but appellant agrees that 222 days is the relevant number for us to consider.

jail credit for the time spent in custody between July 13, 2008, and February 19, 2009, because his sentences were presumptively concurrent and the State acquired probable cause to charge him for felony harassment/stalking before he entered custody on July 13, 2008.

## I.

We begin our analysis by addressing the court of appeals' determination that because Clarkin's sentences were presumptively consecutive he is not entitled to any jail credit for the time spent in custody between July 13, 2008, and February 19, 2009. A criminal defendant is entitled to jail credit for time spent in custody on those convictions that would be sentenced concurrently with the sentence being imposed. *See* Minn. Sent. Guidelines 2.F. According to the Minnesota Sentencing Guidelines, "[g]enerally, when an offender is convicted of multiple current offenses, or when there is a prior felony sentence which has not expired or been discharged, concurrent sentencing is presumptive." Minn. Sent. Guidelines 2.F. In such cases, the use of consecutive sentencing is a departure from the sentencing guidelines and "requires written reasons pursuant to Minn.Stat. § 244.10, subd. 2, and Section 2.D of these guidelines." *Id.* The presumptive rule is subject to the following exceptions: consecutive sentencing is presumptive when the conviction is for a crime committed by an offender serving an executed prison sentence, on supervised or conditional release, or on escape status from an executed prison sentence, and in the case of felony DWI sentences in which the offender has a qualified prior DWI conviction. Minn. Sent. Guidelines 2.F.1. When a consecutive sentence is presumptive, a concurrent sentence "constitutes a departure from the presumptive sentence *except if* the total time to serve in prison would be longer if a concurrent sentence is imposed in which case a concurrent sentence is presumptive." *Id.* (emphasis added).

■ The award of jail credit for those sentences that would be concurrent under the sentencing guidelines is predicated on two underlying principles that reinforce each other. First, jail credit is appropriate for offenses that would have been sentenced concurrently because it is consistent with the purposes of concurrent sentencing under the guidelines and prevents a *de facto* consecutive sentence. *State v. Folley,* 438 N.W.2d 372, 374 (Minn.1989); *State v. Dulski,* 363 N.W.2d 307, 309 (Minn.1985) (holding that defendant was entitled to the credit requested because the two sentences imposed were concurrent, and in the case of concurrent sentences the defendant should be "able to apply the jail time against both of them" (quoting *State v. Patricelli,* 357 N.W.2d 89, 94 (Minn.1984))). In both *Dulski* and *Patricelli,* the defendants were subject to "holds" in one county while a second county investigated an unrelated offense. *Dulski,* 363 N.W.2d at 309; *Patricelli,* 357 N.W.2d at 94. In each case we noted that "since defendant received concurrent sentences, it would be unfair to, in effect, punish him for the state's delay in seeking his arraignment by not allowing him the credit against both concurrent sentences that he otherwise would have received." *Dulski,* 363 N.W.2d at 309 (quoting *Patricelli,* 357 N.W.2d at 94). Both *Dulski* and *Patricelli* highlight the importance of ensuring that the concurrent sentencing rules are appropriately applied to all sentences and preventing State delays in charging from imposing *de facto* consecutive sentences.

■ Second, jail credit is not appropriate for offenses that would have been sentenced consecutively because such

credit would result in double counting against the sentences. *Patricelli*, 357 N.W.2d at 94 ("It would be different if defendant's sentences were consecutive because in that case crediting the defendant for jail time against both sentences would give him an unfair double credit."). Thus, if the sentence that a criminal defendant receives would have been concurrent with the time served on a different charge, the defendant may receive credit. If the sentence would have been consecutive, the defendant does not receive credit.

Here, the court of appeals concluded that, regardless of a probable cause determination, Clarkin was ineligible for any jail credit because if Clarkin had been convicted of harassment/stalking while on intensive supervision for the assault charge, the sentences for his probation violation and the harassment/stalking charges would have been consecutive and not concurrent. *Clarkin*, 804 N.W.2d at 151–52.

As noted previously, crimes committed by a defendant while on supervised release are presumptively consecutive. *See* Minn. Sent. Guidelines 2.F.1. ("Consecutive sentences are presumptive when the conviction is for a crime committed by an offender ... on supervised release."). But a presumptively consecutive sentence is calculated using a criminal history score of one. *Id.* ("For each presumptive consecutive offense sentenced consecutive to another offense(s), a criminal history score of one, or the mandatory minimum for the offense, whichever is greater, shall be used in determining the presumptive duration."). Additionally, "if the total time to serve in prison would be longer if a concurrent sentence is imposed ... a concurrent sentence is presumptive." *Id.*

■ Here, Clarkin was convicted of violating Minn.Stat. § 609.749, subd. 2(a)(1). Clarkin's violation of this statute occurred "within ten years of the first of two or more previous qualified domestic-violence related offense convictions," Minn.Stat. § 609.749, subd. 4(b). The Minnesota Sentencing Guidelines rank this offense at Severity Level 5. *See* Minn. Sent. Guidelines 5. While the record does not conclusively establish Clarkin's criminal history score, Clarkin asserted in his petition for review that his criminal history score is five and a Minnesota Sentencing Guidelines Commission Request for Departure Report in the record corroborates this number.

The presumptive sentence for an offense ranked at Severity Level 5 and a criminal history score of one is 23 months. Minn. Sent. Guidelines 4. But the presumptive sentence for an offense ranked at Severity Level 5 and a criminal history score of five is an executed sentence of 37–51 months in prison. *Id.* Clarkin pleaded guilty and was sentenced to an executed term of 35 months in prison. Under the foregoing sentencing scheme, Clarkin falls into one of the exceptions to consecutive sentencing for crimes committed while on supervised release. This is so because the total time he would serve in prison is longer if a concurrent sentence were imposed (35 months) than if consecutive sentences were imposed (23 months plus 222 days). Thus, a concurrent, not consecutive, sentence is presumptive and accordingly Clarkin is not ineligible for jail credit on the ground that the sentences are consecutive.

■ Clarkin's sentences could nevertheless be consecutive if the district court intended Clarkin's sentences to depart from the presumptive concurrent sentence. *See* Minn. Sent. Guidelines cmt. 2.D.01. The record is silent as to whether the court intended Clarkin's sentences to be concurrent, consecutive, or a departure from either. The potential for concurrent or consecutive sentencing with the prior executed sentence was not mentioned at the sentencing hearing. In the Request

for Departure Report filed several months after Clarkin was sentenced, there is a statement that Clarkin's 35–month sentence as pronounced by the court constituted a mitigated durational departure. The Report invited the court to explain either why Clarkin's sentences were not in fact a departure or, if they were a departure, to justify the departure as required by the Guidelines. The court did neither, choosing simply to check the boxes for "Prosecutor does not object to the departure," and "Plea agreement on sentence." But a defendant's accession to a departure in a guilty plea, by itself, is not a substantial and compelling reason sufficient to support a departure from the presumptive sentence. *State v. Misquadace*, 644 N.W.2d 65, 72 (Minn.2002). Also, "[f]ailure to specify consecutive sentencing means that the sentence is concurrent." *Dulski*, 363 N.W.2d at 309. Thus, we conclude that Clarkin's sentences should properly be characterized as concurrent; therefore, we conclude the court of appeals erred when it used consecutive sentencing as the basis for its decision denying Clarkin the 222 days in jail credit.

## II.

Our conclusion that the court of appeals erred in denying Clarkin jail credit does not end our inquiry. Our next question is whether Clarkin is entitled to 222 days jail credit because Clarkin's sentence for felony harassment/stalking is properly characterized as concurrent with the sentence he received for committing the parole violation for which he was incarcerated from July 13, 2008, until February 19, 2009.

A criminal defendant is entitled to jail credit for time spent in custody "in connection with the offense or behavioral incident being sentenced." Minn. R.Crim. P. 27.03, subd. (B).[4] The defendant has the burden of establishing that he is entitled to jail credit for any specific period of time. *State v. Johnson*, 744 N.W.2d 376, 379 (Minn.2008). "[The] decision whether to award credit is a mixed question of fact and law; the court must determine the circumstances of the custody the defendant seeks credit for, and then apply the rules to those circumstances." *Id.* We review the factual findings underlying jail-credit determinations for clear error, but we review questions of law de novo. *Johnson*, 744 N.W.2d at 379; *Asfaha v. State*, 665 N.W.2d 523, 526 (Minn.2003). The sentencing court does not have discretion in awarding jail credit. *Johnson*, 744 N.W.2d at 379.

We previously enumerated the principles animating the award of jail credit in *State v. Folley*, 438 N.W.2d 372 (Minn. 1989). In *Folley*, the defendant was investigated for sex crimes, and, after the police had completed their investigation into those crimes, had probable cause, and planned to charge the defendant, the defendant was arrested on an unrelated DWI charge. *Id.* at 373–74. While being prosecuted on the DWI charge, the State placed a secret hold on the defendant that stopped him from being charged for the sex crimes. *Id.* The defendant was subsequently acquitted of the DWI charge, but was then arrested on two counts of criminal sexual conduct. *Id.* at 374.

In determining that jail credit was appropriate in *Folley*, we noted that the

---

4. The full text of the rule requires:
When pronouncing sentence the court must: ... State the number of days spent in custody in connection with the offense or behavioral incident being sentenced. That

credit must be deducted from the sentence and term of imprisonment and must include time spent in custody from a prior stay of imposition or execution of sentence.

rules of concurrent sentencing require that district courts ensure that "the withholding of jail credit does not result in a *de facto* departure with respect to consecutive service." *Id.* We indicated that neither indigency nor whether the defendant pleads guilty or insists on a trial should affect whether jail credit is given. *Id.* Additionally, we said "the total amount of time a defendant is incarcerated should not turn on matters that are subject to manipulation by the prosecutor." *Id.* We also said that prosecutorial manipulation need not be intentional to unfairly affect "the charging process to the defendant's disadvantage," and an indication that the investigation on the newly charged offense is complete may weigh in favor of jail credit for time served. *Id.* We noted that "there is some indication in the record that the sex investigation was in fact, completed by the time defendant was arrested for the aggravated DWI charge and that he was told a day or two later that he would be charged with the sex crimes." *Id.* at 375. Taking those factors together, we concluded that an award of jail credit was appropriate.

Rather than following *Folley,* the court of appeals expanded our holding in *Folley* and held that once the State has probable cause to charge a defendant with an unrelated second offense, the defendant is entitled to jail credit for time served on the unrelated first offense. In *State v. Fritzke,* the court of appeals observed that, after the State has probable cause to charge a defendant, "the date on which the complaint is filed is subject to manipulation by the prosecutor." 521 N.W.2d 859, 861–62 (Minn.App.1994). Thus, the court of appeals held that in order to avoid such potential manipulation, "a defendant is entitled to credit for all time spent in custody following arrest, including time spent in custody on other charges, beginning on the date the prosecution acquires

probable cause to charge defendant with the offense for which he or she was arrested." *Id.* at 862. Since *Fritzke,* the court of appeals has consistently awarded jail credit in instances in which probable cause existed prior to the prosecutor's decision to charge a defendant. The court of appeals reached its conclusion in those cases even though there was nothing in the record of those cases to indicate that the State had already made a charging decision, had completed its investigation, or that the other principles outlined in *Folley* were implicated. *See, e.g., State v. Osborne,* No. A08–0760, 2009 WL 1311648, at *4 (Minn.App. May 12, 2009) (determining date probable cause was acquired by police in determining dates for which jail credit should be awarded); *State v. Morales,* 532 N.W.2d 268, 270 (Minn.App.1995) (same); *Fritzke,* 521 N.W.2d at 861–62.

We have neither adopted nor cited the probable-cause test used by the court of appeals and have never explicitly conducted a probable-cause determination in conjunction with an award of jail credit. *See, e.g., State v. Weber,* 470 N.W.2d 112, 114 (Minn.1991) (discussing the application of jail credit to security facilities); *State v. Arden,* 424 N.W.2d 293, 294–95 (Minn. 1988) (holding that jail credit accrues from the date the complaint is filed, not when the offender is sentenced). Instead, we have, as articulated in *Folley,* required a higher standard than probable cause. For example, in *Folley,* the State had more than mere probable cause—the State also had what it considered sufficient evidence to charge and convict the defendant.

Clarkin argues that we should adopt the court of appeals' probable-cause test because all time spent in custody on any charge—related or unrelated to the original offense—is subject to prosecutorial manipulation. Clarkin's argument has some merit because the probable-cause

test is simple and straightforward and can be an effective means of reducing the possibility that the State will manipulate the charging process. But the ability of the probable-cause test to reduce the possibility of manipulation is not sufficient to counterbalance the undesirable incentives this test may create for the State to charge defendants at a point in time earlier than when that charging decision is appropriate or can be justified. We should not encourage such incentives through our jurisprudence.

We believe that the rule established by the principles we outlined in *Folley* is much better at meeting the needs and benefits of all parties that have an interest in the proper resolution of this issue—the State, criminal defendants, and the courts. The *Folley* rule benefits defendants by reducing the possibility of manipulation by the State when it makes charging determinations. We have held that the prosecutor is the sole entity in the criminal justice system with the authority to make charging decisions. *Johnson v. State,* 641 N.W.2d 912, 917 (Minn.2002). The probable-cause rule articulated by the court of appeals creates incentives for the State, and may even require the State, to charge defendants as soon as a determination of probable cause has been satisfied. But a determination of probable cause is per se insufficient to convict a defendant of a crime. Rather, a conviction of a criminal offense requires proof beyond a reasonable doubt. Thus, the probable-cause rule has a significant downside—the promotion of premature charging by the State. The probable-cause test may create an inappropriate, or even a perverse, incentive for the State to charge a defendant before the State believes it is appropriate to do so.

Further, it may well put courts in a position of having to repeatedly second guess the charging decisions made by the State. Our *Folley* rule also benefits the State because it does not force the State as the sole authority responsible for charging decisions to compromise its authority by creating an incentive to make a charging decision on a basis that is, at best, a secondary ground for determining how, with what, and when a defendant should be charged. Our rule also benefits the courts. The rule is simple and straightforward—it simply requires us to determine when the investigation was completed and when the State had a sufficient amount of evidence to charge and potentially convict the defendant.

██ Based on the foregoing analysis, we decline to adopt the court of appeals' probable cause test and instead reaffirm the principles we outlined in *Folley*.[5] We conclude that an award of jail credit is appropriate for time spent in custody after the date when (1) the State has completed its investigation in a manner that does not suggest manipulation by the State, and (2) the State has probable cause and sufficient evidence to prosecute its case against the defendant with a reasonable likelihood of actually convicting the defendant of the offense for which he is charged.

██ Under the rule established by the principles we outlined in *Folley,* 438 N.W.2d at 374, we conclude that Clarkin is not entitled to jail credit for the time he spent in custody from July 13, 2008, until February 19, 2009. It is uncontested that the State did not complete its investigation of the charges against Clarkin until it charged him on November 24, 2009, a date well after Clarkin was out of custody

---

**5.** To the extent that *Fritzke* and other cases from the court of appeals are inconsistent with *Folley,* those cases are overruled.

for his parole violation.[6] Clarkin also does not allege any improper delay in filing the charges. The absence of manipulation by the State is supported by the fact that the harassment/stalking incidents against S.A.S., her brother, her father, and the church were in different cities, and Clarkin's attorney admitted at a pretrial hearing that coordination between police departments and units was difficult. Further, there is no evidence that indigency or Clarkin's decision to plead guilty affected the State's decision of when to charge him. If anything, Clarkin's decision to plead guilty to Count I, on the felony harassment/stalking charge arising out of the July 5, 2008, incident—the only incident charged that occurred before he entered custody on July 13, 2008—cautions against giving jail credit. If Clarkin had pleaded guilty to any other of the counts charged the jail credit issue would not have arisen. Accordingly, we conclude there is no evidence of prosecutorial manipulation or any indication that this situation is inherently subject to manipulation by the State in investigating and charging an offense.

Under the principles enumerated in *Folley*, we conclude that Clarkin is not entitled to apply to his felony harassment/stalking sentence the 222 days jail credit he claims for time spent in custody between July 13, 2008, and February 19, 2009, on the unrelated parole violation. When in custody during this period of time, the State had not completed its investigation into the harassment/stalking offenses. It was not until well after Clarkin was released from custody, on February 19, 2009, that the State had both probable cause and sufficient evidence to charge Clarkin with the harassment/stalking offenses with a reasonable likelihood of convicting him of those offenses. Therefore, we hold that the district court and the court of appeals did not err when they concluded that Clarkin is not entitled to jail credit.

Affirmed.

MEYER, Justice (concurring).

Although I concur with the result reached by the court, I disagree with the majority's legal test for awarding jail credit only in the instances in which the State has completed its investigation and has both probable cause and sufficient evidence to prosecute its case against the defendant with a reasonable likelihood of actual conviction. Instead, I would adopt the court of appeals' probable cause test as outlined in *State v. Fritzke*, 521 N.W.2d 859, 861–62 (Minn.App.1994), and conclude that jail credit is awarded for time spent in custody, including time spent in custody on unrelated charges, beginning on the date the State had probable cause to charge the offense. I would hold that the district court did not err in concluding that the State had not obtained probable cause on the harassment/stalking charges when Clarkin entered custody for the unrelated parole violation on July 13, 2008.

As we outlined in *State v. Folley*, 438 N.W.2d 372, 374 (Minn.1989), certain principles guide our jail credit jurisprudence: consistency with the rules of concurrent sentencing, a desire that neither indigency

---

**6.** Clarkin was being investigated by multiple police precincts for over a dozen harassment/stalking incidents. His modus operandi was to surreptitiously attack his former girlfriend and members of her family and harass them while hiding his identity. It is disingenuous for him to now claim that it was so obvious that he was responsible for the stalking that he should receive jail credit because the State had probable cause to arrest him on the harassment/stalking charge before he was taken into custody on the unrelated parole violation.

nor the decision to plead guilty or insist on a trial should affect the award of jail credit, and the avoidance of prosecutorial manipulation. Prosecutorial manipulation need not be intentional for it to unfairly affect "the charging process to defendant's disadvantage," and an indication that the investigation on the newly charged offense is complete may weigh in favor of jail credit for time served. *Id.*

In *State v. Fritzke,* the court of appeals applied the principles from *Folley* and adopted what is known as the probable-cause rule when awarding jail credit for time served on an unrelated offense

> When there is probable cause to charge a defendant ... and the time constraints of Rule 4.03 [requiring a probable cause determination within 48 hours when a person is arrested without a warrant] do not apply, the date on which the complaint is filed is subject to manipulation by the prosecutor. Thus, a defendant is entitled to credit for all time spent in custody following arrest, including time spent in custody on other charges, beginning on the date the prosecution acquires probable cause to charge defendant with the offense for which he or she was arrested.

521 N.W.2d at 861–62. In other words, the court of appeals gave jail credit even though there was no direct evidence (as there was in *Folley*) that the State had already made a charging decision but had placed a secret hold on the defendant in lieu of charging. While we have never explicitly adopted the court of appeals' probable-cause rule, *Folley* requires and is implicitly predicated on the notion that probable cause existed to charge the defendant with the unrelated offense because the State could not have properly charged him without probable cause.

In applying the probable-cause rule, the district court employs the standards typi-cally applied to probable-cause determinations in the context of arrest warrants. *Fritzke,* 521 N.W.2d at 862. Probable cause exists "where facts have been submitted to the district court showing a reasonable probability that the person committed the crime." *State v. Lopez,* 778 N.W.2d 700, 703 (Minn.2010). "It has been said that the test of probable cause is whether the evidence worthy of consideration, in any aspect for the judicial mind to act upon, brings the charge against the prisoner within reasonable probability." *State v. Florence,* 306 Minn. 442, 446, 239 N.W.2d 892, 896 (1976). "We review factual findings underlying a probable cause determination using the clear error standard, but review the district court's application of the legal standard of probable cause to those facts de novo." *Lopez,* 778 N.W.2d at 703.

I would adopt the *Fritzke* probable-cause rule for several reasons. First, the court of appeals has applied this rule in a predictable manner with few complaints for almost two decades, which is a persuasive reason to allow its continuation. *See, e.g., State v. Osborne,* No. A08–0760, 2009 WL 1311648, at *4 (Minn.App. May 12, 2009) (determining date probable cause was acquired by police in applying jail credit); *State v. Morales,* 532 N.W.2d 268, 270 (Minn.App.1995) (same). Second, ascertaining whether the State has "completed its investigation," or "has probable cause and sufficient evidence to prosecute its case against the defendant with a reasonable likelihood of actually convicting the defendant of the offense for which he is charged," is a standard that is subject to prosecutorial manipulation. The probable-cause rule provides a good check on those situations in which the State could have charged an offender but delayed completing the investigation in order to avoid jail credit. Third, applying the same standard

of probable cause to determine jail credit and whether an offender can be charged is a fair way of holding the State to a consistent standard in charging behavior. If the State did have probable cause but chose not to charge the defendant until after another offense had been sentenced, that decision would implicate the risk of prosecutorial manipulation that *Folley* cautions against. 438 N.W.2d at 374. Fourth, the probable-cause rule is both easily applied by district courts and easily reviewed by our court because it is a test with which district courts are familiar and for which we have enunciated consistent standards.

The court argues that *Folley* alone is better than the probable-cause rule because there is a benefit to the State, criminal defendants, and the courts in charging delay. But *Folley* and the court of appeals' probable-cause rule are not in conflict—the findings in *Folley* implicitly rested on the notion that the State had probable cause to charge the defendant but chose not to do so. Additionally, to the extent that prosecutors use the prospect of jail credit as an incentive to charge criminal defendants earlier than would otherwise be advised, I would characterize such charging manipulation as infringing on the principles underlying jail credit in *Folley*. *Id.* I would thus incorporate the court of appeals' probable-cause rule into the *Folley* standards and hold that a criminal defendant is entitled to jail credit for all time spent in custody following arrest, including time spent in custody on unrelated charges, beginning on the date the State acquires probable cause to charge the criminal defendant with the offense for which he or she was arrested.

Under the *Fritzke* probable-cause rule, if the State acquired probable cause to charge Clarkin with the count of harassment/stalking, Minn.Stat. § 609.749 (2008), related to the July 5, 2008, incident on or before he was arrested on the unrelated parole violation on July 13, 2008, he is entitled to jail credit for the 222 days served between July 13, 2008, and February 19, 2009. If the State did not acquire probable cause until after Clarkin was released on February 19, 2009, he is not entitled to jail credit.[1]

Here, the postconviction court determined that Clarkin was not entitled to jail credit because the State did not acquire probable cause until September 6, 2009, well after Clarkin was released on February 19, 2009. We review the factual findings underlying jail-credit determinations for clear error, but questions of law are reviewed de novo. *State v. Johnson*, 744 N.W.2d 376, 379 (Minn.2008); *Asfaha v. State*, 665 N.W.2d 523, 526 (Minn.2003). The postconviction court here made extensive factual findings about the investigation as of July 13, 2008. First, there were several incidents of suspicious graffiti committed against S.A.S. and her family members in July 2008. Second, S.A.S. and her father believed that Clarkin was responsible for the graffiti. Third, officers found two spray-paint cans at the location where they arrested Clarkin on an unrelated outstanding warrant. Fourth, while in custody, Clarkin denied any involvement in the graffiti damage. The postconviction court then concluded that probable cause to charge Clarkin with felony harassment/stalking, Minn.Stat. § 609.749, arising out of the July 5, 2008, graffiti incident did not exist until the police had some corroborating evidence beyond the suspi-

---

1. No party argues that the State acquired probable cause during Clarkin's time in custody, necessitating a recalculation of the jail credit to which he is entitled, and the record does not support such a determination. On the record, the police do not appear to have investigated Clarkin further while he was in custody.

cion of the victims to indicate that Clarkin was the culprit. The postconviction court placed that date at September 6, 2009, when S.A.S.'s brother gave police a surveillance tape and identified Clarkin as the person on the tape engaging in the act of spray-painting his garage.

I would conclude that the postconviction court did not commit clear error in determining that the police lacked probable cause to charge Clarkin with the crime of felony harassment/stalking before September 6, 2009. There was no evidence beyond suspicion that Clarkin had committed the crime of felony harassment/stalking when he entered custody on July 13, 2008: two spray-paint cans found at a suspect's house are insufficient evidence by themselves, as a spray-paint can is a common household item; there was no physical evidence (such as a handwriting sample, DNA evidence, or fingerprints) or eyewitness identification tying Clarkin to the spray-paint cans; and the police surmised that Clarkin was staying or squatting at the residence where they arrested him and did not permanently reside there. It was not until after Clarkin returned to prison on the unrelated probation violation and was released that the harassment/stalking incidents resumed. After Clarkin's release from prison, evidence was developed that directly tied Clarkin to the graffiti. The postconviction court set the date when Clarkin could be connected to the graffiti incidents as September 6, 2009, because video surveillance provided a positive identification of him committing a crime. While video identification is not always necessary to support a probable cause finding, the postconviction court's finding on probable cause was not clearly erroneous. Thus, I conclude that the district court correctly applied the legal standard for an award of jail credit. Clarkin is not entitled to jail credit for time spent in prison on the unrelated charge.

Because I agree that Clarkin is not entitled to jail credit, I respectfully concur.

ANDERSON, G. BARRY, Justice (concurring).

I join in the concurrence of Justice Meyer.